# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                      No. CR 12-3182 JB

KENNETH ULIBARRI,

      Defendant.

## UNSEALED MEMORANDUM OPINION AND ORDER[1]

    **THIS MATTER** comes before the Court on the Amended Objections to PSR [and]

Sentencing Memorandum, filed May 6, 2015 (Doc. 894)("Amended Objections").[2]  The Court

held a sentencing hearing on May 12, 2015.  The primary issues are: (i) whether the Court should

apply an 8-level adjustment under § 2J1.2(b)(1)(B) of the United States Sentencing Guidelines to

Defendant Kenneth Ulibarri's base offense level of 15; and (ii) whether the Court should strike

mention of K. Ulibarri's distribution-of-heroin arrest in case number CR 14-2211 MV from

paragraph 70 under "Other Arrests" of the Presentence Investigation Report, disclosed April 16,

---

    [1]In its Sealed Memorandum Opinion and Order, filed June 29, 2015 (Doc. 979)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MOO before the Court published a public version of the Sealed MOO.  Sealed MOO at 1 n.1.  The Court gave the parties 14 calendar days to provide notice of any proposed redactions.  See Sealed MOO at 1 n.1.  The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions.  Consequently, the Court is now re-filing the Sealed MOO in its unsealed form.

    [2]Defendant Kenneth Ulibarri filed his Objections to PSR [and] Sentencing Memorandum on May 5, 2015 (Doc. 891)("Objections").  He filed the Amended Objections the following day, noting that "counsel inadvertently filed an unedited draft version of this document" and that "[t]his amended document corrects the first three paragraphs, and adds the first paragraph on page 4."  Amended Objections at 1 n.1.  Because the Amended Objections incorporate K. Ulibarri's arguments from the Objections, the Court will address only the Amended Objections.

2015 ("PSR"), that the United States Probation Office ("USPO") prepared.[3]  First, the Court will not apply § 2J1.2(b)(1)(B), because K. Ulibarri's offense did not involve threatening to cause physical injury to confidential human source 2 ("CHS-2") to obstruct the administration of justice.  Second, the Court will not strike K. Ulibarri's distribution-of-heroin charge from paragraph 70 of the PSR, because the Guide to Judiciary Policy requires the USPO to include all prior criminal history in the PSR, because the PSR specifies that the circumstances of K. Ulibarri's distribution-of-heroin charge are the same as that in this case, and because K. Ulibarri will not suffer any prejudice if the Court leaves that information in paragraph 70 of the PSR.

## FACTUAL BACKGROUND

The Court takes its facts from: (i) the PSR; (ii) the Sealed Response to Defendant Kenneth Ulibarri's Amended Objections to PSR [and] Sentencing Memorandum at 2, filed May 8, 2015 (Doc. 902)("Response"); and (iii) the Indictment, filed December 12, 2012 (Doc. 2)("Indictment").[4]  In June, 2011, the Federal Bureau of Investigation ("FBI") initiated an investigation codenamed Operation Rain Check into co-Defendant Christopher Roybal's drug-trafficking organization ("Roybal DTO").  PSR ¶ 10, at 5.  Operation Rain Check involved numerous investigative techniques, including multiple controlled purchases of kilogram-quantities of cocaine and marijuana using CHS-2.  See Response at 2.  During the course of the controlled purchases, CHS-2 met with and received drugs from co-Defendant George Roybal,

_____

[3]The USPO disclosed two prior versions of the PSR, see Presentence Investigation Report (disclosed July 9, 2013); Presentence Investigation Report (disclosed August 12, 2013), but, as the USPO disclosed the final PSR before any of the parties' objections or briefing on sentencing, the Court will not explain how and why the final PSR differs from the two prior versions.

[4]The Court includes facts from the Response and the Indictment that are not set forth in the PSR solely to provide context to how K. Ulibarri's charges arose and how they relate to the United States' investigation into co-Defendant Christopher Roybal's drug-trafficking organization.  K. Ulibarri does not dispute these facts, and, in any event, the Court does not rely on these facts in its Analysis.

who is K. Ulibarri's uncle, and co-Defendant Jonathon Ulibarri, who is K. Ulibarri's brother.
See Response at 2.  Operation Rain Check culminated in a nineteen-defendant indictment that
Plaintiff United States of America filed in December, 2012.  See Indictment at 1.  K. Ulibarri
was not part of the Roybal DTO and Operation Rain Check did not target him.  See PSR ¶ 10, at
5.  Accordingly, although the Indictment charged J. Ulibarri with a number of offenses, see
Indictment at 1-2, it did not assert any charges against or mention K. Ulibarri.

   After the takedown for Operation Rain Check, one of the co-Defendants in that case
("CHS-1") agreed to cooperate with the United States.  Response at 2.  As part of CHS-1's
cooperation, CHS-1 executed numerous controlled purchases of drugs with a variety of targets,
including K. Ulibarri    See Response at 2.  In May, 2014, the FBI began a separate investigation
into K. Ulibarri's drug-trafficking activities.  See PSR ¶ 10, at 5.  On May 5, 2014, CHS-1
approached K. Ulibarri to buy illegal drugs from him.  See PSR ¶ 11, at 5.  K. Ulibarri offered to
sell CHS-1 methamphetamine and heroin.  See PSR ¶ 11, at 5.  During that conversation, K.
Ulibarri also told CHS-1 that he and several other people were interested in hiring a "hitman" to
kill CHS-2.  PSR ¶ 11, at 5.  K. Ulibarri told CHS-1 that he knew of someone who would kill
CHS-2 for $20,000.00.  See PSR ¶ 11, at 5.  K. Ulibarri further indicated that he had collected
about $8,000.00 from several people, and that others had agreed to give him $7,000.00 more for
the hitman after the murder was completed.  See PSR ¶ 11, at 5.  K. Ulibarri asked CHS-1 to
contribute the remaining $5,000.00 for the hitman.  See PSR ¶ 11, at 5.  CHS-1 told K. Ulibarri
that "the money could be paid from the proceeds earned from selling drugs."  PSR ¶ 11, at 5.

   On May 16, 2015, FBI agents used CHS-1 to conduct a controlled buy of heroin from K.
Ulibarri.  See PSR ¶ 12, at 5.  The agents gave CHS-1 a recording device and $3,000.00, and
instructed CHS-1 to buy four ounces of heroin from K. Ulibarri.  See PSR ¶ 12, at 5.  CHS-1 met

K. Ulibarri and bought the heroin from him for $800.00 per ounce.[5]  See PSR ¶ 12, at 5. After

the transaction, CHS-1 provided the FBI agents with four individually wrapped balls of a brown

substance that field-tested positive for heroin.  See PSR ¶ 12, at 5.

On May 21, 2014, CHS-1 met with FBI agents to plan a controlled drug transaction with

K. Ulibarri.  See PSR ¶ 13, at 5.  The agents gave CHS-1 a recording device and $1,000.00 for

CHS-1 to contribute to the hired murder of CHS-2.  See PSR ¶ 13, at 5.  CHS-1 then met with K.

Ulibarri, and they discussed the hired murder.  See PSR ¶ 13, at 5.  K. Ulibarri offered a deal

with CHS-1, in which CHS-1 could pay him the remaining balance towards the hitman after the

murder was completed.  See PSR ¶ 13, at 5.

On June 4, 2014, CHS-1 met with K. Ulibarri to buy eight ounces of heroin from him that

CHS-1 had previously ordered.  See PSR ¶ 14, at 5.  K. Ulibarri arrived at a pre-determined

location and told CHS-1 to follow him.  See PSR ¶ 14, at 5.  As they left, FBI agents directed

CHS-1 to pull away from K. Ulibarri.  See PSR ¶ 14, at 5.  Detectives[6] then attempted to conduct

a traffic stop of K. Ulibarri, but K. Ulibarri refused to stop.  See PSR ¶ 14, at 5.  While K.

Ulibarri was driving away, FBI agents observed a brown fluid -- later determined to be heroin --

being thrown from the driver's side window of K. Ulibarri's vehicle.  See PSR ¶ 14, at 5.

K. Ulibarri continued to drive around and eventually pulled into a drug store, where he

bought a bottle of lotion.  See PSR ¶ 15, at 5.  Agents arrested K. Ulibarri as he exited the store.

---

[5]The Plea Agreement says that K. Ulibarri sold four ounces of heroin to CHS-1 on May
16, 2015, for $3,200.00.  See Plea Agreement ¶ 10, at 4, filed January 9, 2015 (Doc. 728)("Plea
Agreement").  The PSR states that the agents gave CHS-1 only $3,000.00 to purchase four
ounces of heroin from K. Ulibarri that day, but then notes that CHS-1 bought the heroin from K.
Ulibarri at a price of $800.00 an ounce.  See PSR ¶ 12, at 5.  It is unclear from the PSR where
CHS-1 obtained the extra $200.00 to purchase the heroin, or whether the $3,000.00 that the PSR
mentions is an accurate amount.

[6]The PSR does not provide any additional information about the detectives -- e.g., the
detectives' names or to what police department they belong.

See PSR ¶ 15, at 5.   K. Ulibarri admitted to the agents that he had concealed the heroin in his

rectum, and the agents gave him an opportunity to remove it on his own.   See PSR ¶ 15, at 5.

Instead of pulling the bag out, however, K. Ulibarri removed the heroin from the plastic bag

while in his rectum -- leaving one or two ounces of unwrapped heroin inside his rectum.   See

PSR ¶ 15, at 5.   Concerned that K. Ulibarri might overdose from the heroin, the agents arranged

for K. Ulibarri to be taken to the hospital to remove it.   See PSR ¶ 15, at 5.   Laboratory testing

determined that the heroin which K. Ulibarri sold to CHS-1 weighed 100.6 grams.   See PSR

¶ 16, at 6.   After the FBI tested the heroin, less than 100 grams of the heroin remained; as a

result, K. Ulibarri "was unable to independently weigh the heroin."  PSR ¶ 16, at 6.

## PROCEDURAL BACKGROUND

The Second Superseding Indictment, filed September 9, 2014 (Doc. 626)("Superseding

Indictment"), added K. Ulibarri to the original Indictment against the members of the Roybal

DTO, alleging that: (i) K. Ulibarri attempted to kill CHS-2 by collecting money to hire a hitman

to kill CHS-2, with the intent to prevent CHS-2's attendance and testimony at Roybal's trial, in

violation of 18 U.S.C. § 1512(a)(1)(A); and (ii) K. Ulibarri distributed 100 grams or more of

heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B).   See Superseding Indictment at 29-30.

On January 9, 2015, K. Ulibarri pled guilty to one count of obstruction of justice,[7] in violation of

---

[7]K. Ulibarri originally pled to tampering with a witness.  See Information, filed January 9, 2015 (Doc. 725)("Information")(labeling Count 1 as "Tampering with a Witness," in violation of 18 U.S.C. § 1512(c)(2)); Plea Agreement ¶ 3, at 2 ("The Defendant agrees to . . . plead guilty to Count 1 of the information, charging a violation of 18 U.S.C. § 1512(c)(2), that being Witness Tampering . . . ."). K. Ulibarri explains in the Amended Objections that, after he informally objected to the PSR, "the Government and the Defendant agreed that Obstruction of Justice is a more appropriate description of the charge" to which he had pled. Amended Objections at 1-2. K. Ulibarri further notes: "The parties do not believe that this requires a new plea proceeding as the conduct and subsection to which the Defendant plead is unchanged, only the description or name of the offense." Amended Objections at 2. On May 12, 2015, the United States filed the Amended Information, which describes Count 1 as "Obstruction of Justice" rather than witness

18 U.S.C. § 1512(c), and one count of distribution of heroin, in violation of §§ 841(a)(1), (b)(1)(C).  See Plea Agreement ¶ 3, at 2, filed January 9, 2015 (Doc. 728)("Plea Agreement").

Among other things, the Defendant's Admission of Facts in the Plea Agreement states:

> In May 2014, I met with a confidential source (CHS1) to discuss selling heroin to CHS1.  In those meetings, I told CHS1 that I and some others were hiring a hitman to kill another confidential source (CHS2) for $20,000.  CHS2 is a testifying cooperator in the underlying case (12-cr-3182).  I explained to CHS1 that some people had contributed money towards the hit.  I further explained that some others had promised to pay money after the hit was committed.  Between the cash and the promised monies, I told CHS1 that I still needed additional money towards the hit (approximately $5,000 to $8,000).  I explained to CHS1 that CHS1 could pay half of the money after the hit.  During a meeting on May 21, 2014, at the direction of FBI agents, CHS1 paid me $1,000 and told me it was CHS1's contribution towards the hitman, and CHS1 told me that CHS1 would pay the remaining amount later on.

> The United States maintains that I made these statements with the intent of hiring a hitman to kill CHS2.  However, I maintain that these statements to CHS1 about killing CHS2 were false and that I made these statements about a hitman for the purpose of obtaining money from CHS1.  Either way, I admit that the natural and probable effect of the statements I made was to interfere with, obstruct, or influence an official proceeding.  Thus, by making these statements to CHS 1 about the hitman and accepting the $1,000 from CHS1, I corruptly obstructed, influenced, and impeded an official proceeding, that being the underlying charges in this case.

Plea Agreement ¶¶ 10-11, at 4-5.

On January 29, 2015, the United States debriefed J. Ulibarri.  See Response at 4.  During that debrief, the United States asked J. Ulibarri about his brother's murder-for-hire scheme, and J. Ulibarri said that he did not think that his brother is smart enough to organize a hitman.  See Response at 4.  When the United States asked J. Ulibarri why his brother accepted only $1,000.00 from CHS-1 and assured CHS-1 that CHS-1 could pay the rest of the money after the

---

tampering.  Amended Information, filed May 12, 2015 (Doc. 908)("Amended Information"). That same day, K. Ulibarri pled to the Amended Information.  See Plea Minute Sheet, filed May 12, 2015 (Doc. 912).

murder was completed, J. Ulibarri said that he believed it was so that the plot would seem more credible to CHS-1.  See Response at 4-5.

The USPO disclosed the PSR on April 16, 2015.  See PSR at 1.  Relying on § 2J1.2, the USPO calculates a base offense level of 14 for K. Ulibarri.  See PSR ¶ 22, at 6.  The USPO applies an 8-level increase to K. Ulibarri's base offense level under § 2J1.2(b)(1)(B), because K. Ulibarri discussed his murder-for-hire scheme with CHS-1.  See PSR ¶ 23, at 7.  The USPO also applies a 2-level increase under § 2D1.1, because that section provides that an offense involving 100.6 grams of heroin has a base offense level of 24.  See PSR ¶ 28, at 7.  The USPO then recommends a 3-level decrease for K. Ulibarri's timely acceptance of responsibility and a 2-level increase for a multiple-count adjustment.  See PSR ¶¶ 34-37, 40-41, at 7-8.  The PSR thus calculates K. Ulibarri's total offense level to be 23.  See PSR ¶ 41, at 8.  The PSR also calculates a criminal history score of 8: (i) 3 points for K. Ulibarri's 1997 convictions for receiving or transferring a stolen motor vehicle, and criminal damage to property, see PSR ¶ 45, at 9; (ii) 1 point for K. Ulibarri's 2002 convictions for driving under the influence of alcohol or drugs, and possession or use of marijuana, see PSR ¶ 48, at 10; (iii) 1 point for K. Ulibarri's 2004 conviction for felony possession of marijuana, see PSR ¶ 49, at 10; (iv) 1 point for K. Ulibarri's 2012 conviction for driving under the influence of alcohol, see PSR ¶ 52, at 12; and (v) 2 points, because K. Ulibarri committed the offenses in this case while serving probation for his 2012 conviction, see PSR ¶ 55, at 13.  K. Ulibarri's total offense level of 23 and criminal-history category of IV results in a Guideline imprisonment range of 70 to 87 months.  See PSR ¶ 87, at 23.

1.      __The Amended Objections__.

K. Ulibarri filed the Amended Objections on May 6, 2015.  See Amended Objections at 1.   K. Ulibarri first objects to the PSR's application of the 8-level adjustment under § 2J1.2(b)(1)(B).  See Amended Objections at 2.  In his view, § 2J1.2(b)(1)(B) requires an intent to obstruct the administration of justice.  See Amended Objections at 2.  K. Ulibarri relies on United States v. Calvert, 511 F.3d 1237 (9th Cir. 2008), in which the United States Court of Appeals for the Ninth Circuit said that the defendant "'makes the unremarkable proposition that the increase only applies where the defendant acts with an intent to obstruct the administration of justice,'" and held that the defendant's convictions for conspiracy to retaliate against a witness and retaliation against a witness satisfied § 2J1.2(b)(1)(B)'s intent requirement.  Amended Objections at 2 (quoting United States v. Calvert, 511 F.3d at 1240-41).  K. Ulibarri notes that, in United States v. Wardell, 591 F.3d 1279 (10th Cir. 2009), the United States Court of Appeals for the Tenth Circuit held that a conviction under § 1513(b)(1) satisfies § 2J1.2(b)(1)(B)'s intent requirement.  See Amended Objections at 2.  K. Ulibarri points out that § 1513(b)(1) requires as an element of the offense that the defendant acted "'with intent to retaliate against any person . . . .'"  Amended Objections at 2 (quoting 18 U.S.C. § 1513(b)(1))(alterations in Amended Objections).

K. Ulibarri says that, by contrast, the crime to which he pled guilty -- obstruction of justice under § 1512(c)(2) -- does not contain an intent element.  See Amended Objections at 2.  According to K. Ulibarri, that subsection requires only that a person "'corruptly otherwise obstructs, influences, or impedes any official proceeding . . . .'"  Amended Objections at 2-3 (quoting 18 U.S.C. § 1512(c)(2))(alterations in Amended Objections).  K. Ulibarri points out that, unlike § 1512(c)(2), every other subsection of § 1512 requires that the underlying conduct

be done "'with intent'" or "'intentionally.'"  Amended Objections at 3 (quoting 18 U.S.C. §

1512).  K. Ulibarri highlights United States v. Suarez, No. CR 13-0420, 2014 WL 1898995

(N.D. Ohio May 8, 2014), in which the Honorable Patricia A. Gaughan, United States District

Judge for the Northern District of Ohio, said that "'it does not appear that Section 1512(c)(2) has

an intent element.'"  Amended Objections at 3 (quoting United States v. Suarez, 2014 WL

1898995, at *3).  K. Ulibarri adds that, in United States v. Phillips, 583 F.3d 1261 (10th Cir.

2009), the Tenth Circuit held that § 1512(c)(2)'s mens rea requirement is satisfied if "'it is

foreseeable that the defendant's conduct will interfere with an official proceeding.'"  Amended

Objections at 3 (quoting United States v. Phillips, 583 F.3d at 1263-64).  K. Ulibarri contends

that, because § 2J1.2(b)(1)(B) requires an intent to obstruct justice and § 1512(c)(2) requires no

such intent, "the mere fact that Ulibarri admitted that he made the statements about a 'hitman' is

insufficient to warrant the application of 2J1.2(b)(1)(B)."  Amended Objections at 3.

K. Ulibarri argues that a § 2J1.2(b)(1)(B) adjustment is similarly not warranted under a

relevant-conduct theory.  See Amended Objections at 3.  K. Ulibarri says that he has consistently

denied that there ever was a hitman and has instead asserted that his statements' only purpose

was to obtain money from CHS-1.  See Amended Objections at 3.  K. Ulibarri points out that the

United States has no evidence of a hitman and no evidence that anyone but CHS-1 knew about

his statements.  See Amended Objections at 3.  K. Ulibarri argues that, in short, "there is no

evidence of an intent to obstruct justice and the mere making of the statements coupled with the

denial as to their truth does not establish an intent."  Amended Objections at 3 (internal quotation

marks omitted).

K. Ulibarri next objects to paragraph 70 of the PSR, which lists his distribution-of-heroin

charge under "Other Arrests."  Amended Objections at 4 (quoting PSR ¶ 70, at 17-18)(internal

quotation marks omitted).  K. Ulibarri says that, after he informally objected to this paragraph, the USPO declined to remove it, because "it is not the same case, as it is associated with a different Docket Number."  Amended Objections at 4.  K. Ulibarri points out that the arrest for distribution of heroin resulted in an indictment in MV 14-221, but that the United States dismissed that indictment after filing the Superseding Indictment in the case involving the Roybal DTO, which added K. Ulibarri's distribution-of-heroin and obstruction-of-justice charges.  See Amended Objections at 4.  K. Ulibarri notes that, although the arrest was initially listed under a different docket number, it is still the same case as this one.  See Amended Objections at 4.

2.    **The Addendum.**

On May 6, 2015, the USPO responded to the Amended Objections.  See Addendum to the Presentence Report, disclosed May 6, 2015 ("Addendum").  In response to K. Ulibarri's first objection, the USPO points out that, in United States v. Gordon, 710 F.3d 1124 (10th Cir. 2013), the Tenth Circuit noted that "'acting corruptly within the meaning of § 1512(c)(2) means acting with an improper purpose and to engage in conduct knowingly and dishonestly with the specific intent to subvert, impede or obstruct' an official proceeding."  Addendum at 2 (quoting United States v. Gordon, 710 F.3d at 1151).  The USPO explains:

> The enhancement pursuant to U.S.S.G. § 2J1.2(b)(1) "does not impose an additional 'seriousness' requirement beyond the fact of a violent threat.  Although the background commentary indicates that the guideline reflects 'the more serious forms of obstruction,' . . . we agree with out sister circuits that have found that threats of violence, as such, necessarily fit within this category."  United States v. Plumley, 207 F.3d 1086, 1090-91 (8th Cir. 2000).
>
> Relevant conduct holds the defendant accountable for all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.  U.S.S.G. § 1B1.3.  The defendant's

statements about hiring a hitman and collecting money to pay for the murder are considered.

The defendant plead guilty to 18 U.S.C. § 1512(c)(2), which includes an element of intent, as interpreted by 10th Circuit case law, which also satisfies the intent element required for the application of the enhancement. Further, the defendant admitted to the nexus between the wrongful conduct and the official proceeding in the plea agreement. Based on the above information, it is believed the eight level enhancement pursuant to U.S.S.G. § 2J1.2(b)(1)(B) is appropriate and the presentence report will not be changed.

Addendum at 2 (omission in Addendum)(citation omitted)(internal quotation marks omitted).

Addressing K. Ulibarri's second objection, the USPO says that the offense listed in paragraph 70 is associated with a different docket number from the one in this case. See Addendum at 2. The USPO notes that the narrative included in the arrest notes that the circumstances of that arrest are the same as those of the offense in this case. See Addendum at 2. The USPO asserts that the PSR lists all arrests and docket numbers that are associated with K. Ulibarri, in accordance with the Guide to Judiciary Policy, which states that presentence reports must contain "any prior criminal record." Addendum at 2 (citation omitted)(internal quotation marks omitted).

**3.    The Response.**

The United States responded to the Amended Objections on May 8, 2015. See Response at 1. The United States asks the Court to overrule K. Ulibarri's objection to the PSR's § 2J1.2(b)(1)(B) application. See Response at 9. The United States asserts that § 2J1.2(b)(1)(B)'s application notes clarify that it may apply to a variety of offenses and that "'the specific offense characteristics reflect the more serious forms of obstruction.'" Response at 5 (quoting commentary background to U.S.S.G. § 2J1.2(b)(1)(B)). The United States contends that K. Ulibarri's solicitation and acceptance of money toward a hitman to kill CHS-2 "is a crime that cannot be tolerated in the United States' justice system." Response at 5. In the United

States' view, "[t]o brush off the seriousness of this offense based solely on the defendant's after-the-fact claim that he was just kidding would undermine the safety of countless numbers of cooperators."  Response at 5.

The United States maintains that the circumstances surrounding K. Ulibarri's murder-for-hire plot suggest that he devised the plot in an attempt to benefit J. Ulibarri, G. Roybal, and, perhaps to a lesser extent, his cousin, C. Roybal.  See Response at 6.  The United States points out that K. Ulibarri met with CHS-1 on numerous occasions over two weeks during which he talked to CHS-1 repeatedly about his murder-for-hire plan.  See Response at 7.  The United States says that, of all the details which K. Ulibarri shared with CHS-1, "the one that stands out the most" is that K. Ulibarri was "totally fine" with CHS-1 paying the remainder of his $5,000.00 contribution after CHS-2's murder.  Response at 7.  The United States asserts that, if K. Ulibarri truly intended to steal money from CHS-1, one would expect that he would have pressured CHS-1 into contributing more money at that time.  See Response at 7.  "Instead," the United States contends, "we are left with the defendant's chilling assurances that CHS-1 could just settle up his tab after the murder."  Response at 7.

The United States adds that the Court should afford little weight to J. Ulibarri's statements about his brother's inability to concoct and execute a murder-for-hire scheme.  See Response at 8.  The United States explains that, if this case had gone to trial, it would have offered evidence that K. Ulibarri told CHS-1 that the hitman was J. Ulibarri's "connection."[8] Response at 8.  The United States argues that, when he spoke with the United States -- twenty days after his brother pled guilty -- J. Ulibarri likely knew what his brother had admitted to the

---

[8]The Response provides no further information about J. Ulibarri's "connection," e.g., whether the connection was J. Ulibarri's friend, business associate, or family member.

United States.  See Response at 8.  "By expressing the opinion that that there was no hitman," the United States asserts, J. Ulibarri was also "denying his involvement in the murder-for-hire plot."  Response at 8.  The United States contends that, accordingly, the Court should afford little weight to J. Ulibarri's self-serving statements.  See Response at 8.

The United States urges that, even if the Court accepts K. Ulibarri's version of events, that conclusion does not mean that K. Ulibarri did not intend to obstruct the administration of justice.  See Response at 6.  The United States asks: "Why else would the defendant suggest a scheme . . . premised on killing a key witness who was going to testify against his brother and his uncle?"  Response at 6.  The United States says that, even if K. Ulibarri's story is true, he knew that spreading the word that there was a hit out on CHS-2's life would have a chilling effect on CHS-2's willingness to continue cooperating with the United States.  See Response at 6.  The United States argues that K. Ulibarri's purported ruse "is one of the most serious nature" and that, to not apply § 2J1.2(b)(1)(B) would cause this "extremely serious offense" to be grouped at an offense level with relatively benign conduct overall.  Response at 7.[9]

**4.    The Reply.**

K. Ulibarri replied to the Response on May 10, 2015.  See Reply to Responses to Objections to PSR [and] Sentencing Memorandum, filed May 10, 2015 (Doc. 903)("Reply").  K. Ulibarri first addresses the USPO's reliance on United States v. Gordon for the proposition that § 1512(c) includes an intent element.  See Reply at 1.  In K. Ulibarri's view, that case addresses only § 1512(c)'s attempt portion, which requires an intent to commit the substantive offense.  See Reply at 1 (citing United States v. Gordon, 710 F.3d at 1150 ("[W]e are free to focus on whether any rational finder of fact would have found Mr. Gordon guilty of the attempt offense

---

[9]The Response does not address K. Ulibarri's second objection to the PSR.

(as opposed to the substantive offense), and we elect to do so."   (internal quotation marks omitted)).   K. Ulibarri contends that <u>United States v. Gordon</u> is inapplicable, because he did not plead to attempt.   <u>See</u> Reply at 1.

K. Ulibarri says that the United States does not address whether § 1512(c) has an intent element, but rather attempts to "bootstrap" foreseeability into intent.   Reply at 1.   K. Ulibarri acknowledges that his statements had the natural and probable effect of obstructing an official proceeding.   <u>See</u> Reply at 2.   K. Ulibarri urges, however, that his concession does not mean that he made his threat with the intent to obstruct the administration of justice.   <u>See</u> Reply at 2.   K. Ulibarri asserts that the facts upon which the United States relies "are significant for what is not there."   Reply at 2.   K. Ulibarri notes that CHS-1 is the only person who asserted any knowledge about the plot, and that the United States has failed to offer any other evidence of a hitman or a plan to hire a hitman.   <u>See</u> Reply at 2.

K. Ulibarri argues that, although the Response refers to "all of the details that the defendant shared with CHS-1," he, in fact, shared few details with CHS-1 about the plot.   Reply at 3 (quoting Response at 7)(internal quotation marks omitted).   K. Ulibarri says: "At approximately 48:40 of CD-2, File 1671.001, recorded May 21, 2014, the Defendant told CHS-1 that he (the Defendant) was the only one who knew, and later at approximately 51:30 that it would be all 'me' (the Defendant), and 'you' (CHS-1) don't need to know anything about all this."   Reply at 3 (citation omitted).   K. Ulibarri contends that the existence of a hitman does not answer the intent question completely, because a person could spread a false rumor about a hitman, but do so with the intent to obstruct an official proceeding.   <u>See</u> Reply at 3.   K. Ulibarri argues, however, that, without any evidence of a hitman, the Court is left with the statements and his explanation of those statements, which the United States "can rebut only with speculation."

- 14 -

Reply at 3.  K. Ulibarri concludes that, even with a preponderance of the evidence standard, the United States cannot overcome his unrebutted and uncontradicted explanation of those statements.  See Reply at 3.

5.      **The May 12, 2015, Hearing.**

The Court held a hearing on May 12, 2015.  See Transcript of Hearing (taken May 12, 2015)("Tr.").[10]  The Court began the hearing by noting that there are two circumstances in which § 2J1.2(b)(1)(B) applies: (i) the offense involved causing physical injury to a person to obstruct the administration of justice; or (ii) the offense involved threatening to cause physical injury to a person to obstruct the administration of justice.  See Tr. at 4:2-17 (Court).  Upon the Court's questioning, the United States agreed that it was not arguing that (i) applies in this case.  See Tr. at 4:17-5:2 (Court, Long).  The Court then said that whether § 2J1.2(b)(1)(B) applies thus turns on whether K. Ulibarri's offense involved threatening to cause physical injury to CHS-2.  See Tr. at 5:3-13 (Court, Long).  The Court asked the United States whether a threat would include a situation in which the defendant is sitting across a kitchen table and tells person *A* that he or she is going to kill person *B*, but does not intend for person *B* to ever learn about the threat.  See Tr. at 5:20-25 (Court).  The Court said that, based on its research, the speaker must intend to communicate his or her threat to a victim for the statement to constitute a threat.  See Tr. at 6:5-7:2 (Court).  The United States responded that the Court's definition of threat would conflict with the United States Sentencing Commission's intent in adopting § 2J1.2(b)(1)(B) and pointed to § 2J1.2(b)(1)(B)'s structure:

> When you . . . go through the specific offense characteristics, it starts with a four-level enhancement under subpart A . . . .  That will apply to certain conduct

---

[10]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

of a less[] serious nature.  Subsection B then involves when there is causing or
threatening to cause fiscal injury.  Subsection C involves terrorism or domestic
terrorism and some other . . . crimes that wouldn't really fit.  So really what the
Sentencing Commission was trying to accomplish in this [section] is, because
obstruction of justice can encompass so many different t[ypes] of harms and so
many different types of crimes, the Sentencing Commission specified that the
specific offense characteristics should apply to separate out much less serious
conduct from much more serious conduct, and then depending on the . . .
seriousness of the conduct[,] you'll have either the four level, eight level, or
twelve level.

Tr. at 7:14-8:9 (Long).

The United States reiterated that it should be sufficient that K. Ulibarri attempted or

intended to cause physical injury to CHS-2 for § 2J1.2(b)(1)(B).  See Tr. at 9:16-10:17 (Long).

The Court replied that the United States' approach would read "attempted or intended to cause

physical injury" into § 2J1.2(b)(1)(B).  Tr. at 8:16-10:22 (Court).  The United States responded

that the Court's definition would exclude from § 2J1.2(b)(1)(B) situations where a defendant told

another person in jail that he was going to kill his judge.  See Tr. at 11:20-12:5 (Long).  The

United States said that the Court's proposed definition of threat would strip the United States of

its ability to ensure that such a defendant receives the appropriate sentence for threatening to kill

a judge.  See Tr. at 12:5-13 (Long).

When K. Ulibarri took the lectern, he said that he did not address the Court's concerns in

the briefing, because there is a lot of case law which says that a threat does not have to be

communicated directly to the person who is being threatened.  See Tr. at 13:10-19 (Couleur).

The Court agreed with that assessment, but said that its definition of threat turns on whether the

defendant intended for the person to know about the threat.  See Tr. at 13:20-14:4 (Court).  K.

Ulibarri said that he agreed with the Court's definition, but noted that he was concerned about

advancing that definition, because, in United States v. Martin, 163 F.3d 1212 (10th Cir. 1998),

the Tenth Circuit said:

> [I]t is not necessary to show that the defendant intended to carry out the threat, nor is it necessary to prove that the defendant actually had the apparent ability to carry out the threat. The question is whether those who hear or read the threat reasonably consider that an actual threat has been made. It is the making of the threat, not the intention to carry it out, that violates the law.

Tr. at 17:9-16 (Couleur)(quoting United States v. Martin, 163 F.3d at 1216)(internal quotation marks omitted). K. Ulibarri said that, because of that case law, he approached the issue from a different perspective, i.e., that § 1512(c) does not require that the defendant intended to obstruct justice. See Tr. at 15:9-17:8 (Couleur).

The Court then read from United States v. Heineman, 767 F.3d 970 (10th Cir. 2014), in which the Honorable Harris L. Hartz, United States Circuit Judge for the Tenth Circuit, said:

> We read [Virginia v. ]Black, [538 U.S. 343 (2003),] as establishing that a defendant can be constitutionally convicted of making a true threat only if the defendant intended the recipient of the threat to feel threatened. The majority of the Court said that "'[t]rue threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."

Tr. at 19:1-20:9 (Court)(emphasis in United States v. Heineman). K. Ulibarri responded that, if threat requires intent, then he would agree with the Court that he did not threaten CHS-2. See Tr. at 21:21-24 (Couleur). K. Ulibarri said that, even if § 2J1.2(b)(1)(B) does not require that the defendant intended to communicate the threat to the victim, the adjustment still does not apply, because he did not intend to obstruct justice. See Tr. at 22:4-9 (Couleur).

The Court said that it disagreed with K. Ulibarri on the latter point, noting that there probably is enough evidence to conclude by a preponderance of the evidence that he intended to hire a hitman. See Tr. at 22:21-23:24 (Court). In response, K. Ulibarri reiterated his arguments from the Amended Objections and the Reply -- namely, that the United States has offered only his statements to show that he intended to hire a hitman and has not produced any other evidence to corroborate its theory. See Tr. at 24:23-28:7 (Couleur). K. Ulibarri concluded his argument

- 17 -

by noting that there is no evidence contradicting his version of events, i.e., that he wanted only to steal money from CHS-1.  See Tr. at 29:11-19 (Couleur).

As the United States started its rebuttal, the Court asked what it thought of Judge Hartz' definition of threat in United States v. Heineman; the United States responded that, "to do any justice to the Court's question, [it would] probably have to review the case, and then [the] statute that was at issue," which is 18 U.S.C. § 875.  Tr. at 31:13-17 (Long).  When pressed, the United States noted that § 875 is in a different chapter of the United States Code from § 1512(c) -- the charge to which K. Ulibarri pled -- and from § 115, the statute on which the Tenth Circuit focused in United States v. Martin.  See Tr. at 31:18-32:7 (Court, Long).  The United States added that it was unsure whether studying the multiple definitions of threat under federal law would resolve the issue, because applying United States v. Heineman's definition of threat to § 2J1.2(b)(1)(B) would lead to an absurd result.  See Tr. at 33:3-5 (Long).  The United States posited that, if the Court used United States v. Heineman's definition in the § 2J1.2(b)(1)(B) context, it would apply the adjustment when a defendant says "I'm going to kill you if you testify," but not when a defendant covertly hires a hitman to kill the witness, but fails to execute his plan -- which is much more serious conduct.  Tr. at 35:2-8 (Long).

The Court said that, although it agreed with the United States' concerns about the consequences of defining threat narrowly under § 2J1.2(b)(1)(B), it is stuck with the Sentencing Commission's use of the word "threatening" rather than "attempted or intended to cause."  Tr. at 35:11-14 (Court).  The Court reiterated that the United States' definition reads additional words into § 2J1.2(b)(1)(B).  See Tr. at 35:16-20 (Court).  The Court asked the United States why, if the Sentencing Commission intended § 2J1.2(b)(1)(B) to have the meaning that the United States

proposes, it did not use the words "attempted or intended to cause" in that section.   Tr. at
38:18-21 (Court).  The United States replied:

> I think that a common sense interpretation that[,] if the offense involved
> threatening to cause physical injury . . ., when you have someone who is putting
> together a hitman to kill a defendant, I think that that would be satisfied. . . .  So I
> don't think the Court should be asking could it have been written better?  Yes.  As
> it's written, should it, as a matter of policy, encompass the conduct before the
> Court today?  Yes.

Tr. at 38:22-39:10 (Long).

Addressing his second objection to the PSR, K. Ulibarri reiterated the arguments from the

Amended Objections, and noted that the PSR's inclusion of the distribution-of-heroin charge

from this case under "Other Arrests" is "without form or substance," because there was only one

arrest that resulted in the two cases.  Tr. at 41:10-16 (Couleur).  The United States responded that

the PSR's explanation that the circumstances of that arrest are the same as those in the case's

offense should address K. Ulibarri's concern.  See Tr. at 42:1-5 (Long).  The United States

added, however, that there is no harm in removing the PSR's reference to the charge under

"Other Arrests."  Tr. at 42:6-7 (Long).  The Court said that it would take both of K. Ulibarri's

objections under advisement, and would try to issue an opinion and order as soon as possible.

See Tr. at 44:4-15 (Court).

## RELEVANT LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States

of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-

473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory.  In excising

the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C.

§ 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide

sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant; and
>
> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines are one of several factors enumerated in § 3553(a), they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006).  This presumption, however, is an appellate presumption and not one that the trial court can or should apply.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007).  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence.  Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures.  The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.).  The Supreme Court recognized, however, that the sentencing judge is

"in a superior position to find facts and judge their import under § 3553(a) in each particular case." Kimbrough v. United States, 552 U.S. at 89.  Applying § 3553(a)'s factors, the Court has found that the case of an illegal immigrant who re-enters the United States to provide for his two children and two siblings was not materially differentiated from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted.  See United States v. Alemendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec.14, 2010)(Browning, J.).  On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court found that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction."  2011 WL 831279, at *14.

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute." 530 U.S. at 481.  The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and that the Sixth Amendment of the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. at 490.  In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in Apprendi v. New Jersey, stating that the "statutory maximum for Apprendi purposes

is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."   542 U.S. at 303 (emphasis omitted)(citations omitted)(internal quotation marks omitted).  In United States v. Booker, the Supreme Court held that, because the sentencing guidelines are no longer mandatory, "Apprendi does not apply to the present advisory-Guidelines regime."  United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013).  See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes the relevant sentencing rules mandatory and imposes binding requirements on all sentencing judges -- the statute falls outside the scope of Apprendi's requirement."   (alterations omitted)(internal quotations marks omitted)).   The Supreme Court has recently held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence.  See Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013).

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that Blakely v. Washington and United States v. Booker had not changed the district court's enhancement-findings analysis.  See United States v. Magallanez, 408 F.3d at 684-85.  United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant, Magallanez, guilty of conspiracy to possess with intent to distribute and to distribute methamphetamine.  See 408 F.3d at 676.  As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on testimony of the various amounts that government witnesses indicated they had sold to the defendant -- attributed 1200 grams of methamphetamine to the defendant and used that amount to increase his sentence under the Guidelines.  See United States v. Magallanez, 408 F.3d at 682.   The district court's findings increased the defendant's

Guidelines sentencing range from 63 to 78 months to 121 to 151 months.  See United States v. Magallanez, 408 F.3d at 682-83.  The Tenth Circuit stated that, both before and after Congress' passage of the Sentencing Reform Act, "sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict."  United States v. Magallanez, 408 F.3d at 684.  Although United States v. Booker made the Guidelines "effectively advisory," the Tenth Circuit in United States v. Magallanez reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before."  408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance."  United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[11]  "[T]he application of an enhancement . . . does not

---

[11]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since classified its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105).  See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)).  The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence.  United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation). See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance of the evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the

implicate the Supreme Court's holding in Apprendi v. New Jersey." United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *3 (D.N.M. June 26, 2012)(Browning, J.). The Tenth Circuit applies Apprendi v. New Jersey's requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction." United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005). Accord United States v. Ray, 704 F.3d at 1314. A defendant may assert an error under Apprendi v. New Jersey only where the fact at issue increased his sentence beyond the statutory maximum. See United States v. O'Flanagan, 339 F.3d 1229, 1232 (10th Cir. 2003)(holding that a defendant could not assert an error under Apprendi v. New Jersey, because "his sentence does not exceed the statutory maximum"); United States v. Hendrickson, No. 12-5016, 2014 WL 6679446, at *6 (10th Cir. Nov. 25, 2014)(unpublished)[12](holding that,

defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (finding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms).

[12]United States v. Hendrickson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court finds that United States v. Hendrickson, United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished), and United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished), all have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Sealed Memorandum Opinion and Order.

after Alleyne v. United States, "[i]t is well-established that sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence").  As the Court has noted:

> The Court explained that, although the decision of the Supreme Court of the United States in Alleyne v. United States, . . . 133 S. Ct. 2151 . . . (2013), expands the rule from Apprendi v. New Jersey, 530 U.S. 466 . . . (2000)(holding that facts that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that increase the mandatory minimum sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence.  See [United States v. Sangiovanni, No. CR 10-3239 JB,] 2014 WL 4347131, at *22-26 [(D.N.M. Aug. 29, 2014)(Browning, J.)].

United States v. Cervantes-Chavez, No. CR 14-0259 JB, 2014 WL 6065657, at *14 (D.N.M. Nov. 3, 2014)(Browning, J.).

## LAW REGARDING RELEVANT CONDUCT FOR SENTENCING

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under [U.S.S.G.] § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context."  U.S.S.G. § 1B1.1, cmt. 1(H).  In United States v. Booker, the Supreme Court noted:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction.  That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)).  The Supreme Court's reasoning in United States v. Booker suggests that the consideration of real conduct is necessary to effectuate Congress' purpose in enacting the guidelines.

Section 1B1.3 provides that the base offense level under the guidelines "shall be determined" based on the following:

(1)    (A)    all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant;

       (B)    in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)    solely with respect to offenses of a character for which [U.S.S.G.] § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)    all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4)    any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  The court may consider, as relevant conduct, actions that have not resulted in a conviction.  Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct.  The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard.  See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.). Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review.").  The evidence and information upon which

the court relies, however, must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct comes primarily from two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997).  In Witte v. United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge.  The defendant in Witte v. United States had been involved in an unsuccessful 1990 attempt to import marijuana and cocaine into the United States, and in a 1991 attempt to import marijuana.  See 515 U.S. at 392-93.  In March 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import narcotics.  See 515 U.S. at 392-93.  At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and therefore calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with the 1990 activities.  See 515 U.S. at 392-93.  The defendant moved to dismiss the indictment, arguing that he had already been punished for the cocaine offenses, because the district court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See 515 U.S. at 395.  The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the

prohibition against multiple punishments, which the Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States provides.  See 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reversed the district court and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals, including the Tenth Circuit, that had previously considered this question.  See 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the circuits and affirmed the Fifth Circuit.  See 515 U.S. at 395.  In finding that the district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401.  The Supreme Court reasoned that sentencing courts had always considered relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  515 U.S. at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity."  515 U.S. at 403.

In <u>United States v. Watts</u>, the Supreme Court, in a per curiam opinion, relied upon <u>Witte v. United States</u>' holding and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted.  <u>See</u> 519 U.S. at 149.  In reaching its result in <u>United States v. Watts</u>, the Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the United States Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence.  <u>See</u> 519 U.S. at 149 (citing, <u>e.g.</u>, <u>United States v. Coleman</u>, 947 F.2d 1424, 1428-29 (10th Cir. 1991)).  The Supreme Court began its analysis in <u>United States v. Watts</u> with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.  <u>See</u> <u>United States v. Watts</u>, 519 U.S. at 151.  According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion."  <u>United States v. Watts</u>, 519 U.S. at 151-52.

Tenth Circuit case law adheres closely to the Supreme Court's results in <u>Witte v. United States</u> and <u>United States v. Watts</u>.  <u>See</u> <u>United States v. Andrews</u>, 447 F.3d 806, 810 (10th Cir. 2006)(applying <u>Witte v. United States</u>' holding to affirm that a career offender enhancement does not violate the Double Jeopardy Clause of the Fifth Amendment).  In <u>United States v. Banda</u>, 168 F. App'x 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a

preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard."  168 F. App'x at 290.  The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment.  Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'"  168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant, Troy Coleman, appealed the district court's enhancement of his sentence for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime.  See 947 F.2d at 1428.  The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal of firearms charges.  See United States v. Coleman, 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing Coleman's sentence for possession of a firearm.  See United States v. Coleman, 947 F.2d at 1429.  The Tenth Circuit based its conclusion on evidence that: (i) individuals at the arrest scene handled the

weapons at will; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved. See 947 F.2d at 1429. The Tenth Circuit summarized that, in reviewing federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted." 947 F.2d at 1429.

In United States v. Washington, 11 F.3d 1510 (10th Cir. 1993), the defendant, Patrick Washington, argued that the United States should prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence rather than by a preponderance of the evidence. See 11 F.3d at 1512. The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life. See 11 F.3d at 1515. The defendant argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required." 11 F.3d at 1515. Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard." 11 F.3d at 1516 (citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)). See United States v. Sangiovanni, No. CR 10-3239 JB, 2014 WL 4347131, at *22-26 (D.N.M. Aug. 29, 2014)(Browning, J.)(ruling that a sentencing court can cross reference from the guidelines that corresponds to the defendant's crime of conviction to the guidelines for another, more harshly punished crime, if it can be established by a preponderance of the evidence that the

defendant committed the more serious crime); United States v. Cervantes-Chavez, No. CR 14-0259, 2014 WL 6065657, at *14-15 (D.N.M. Nov. 3, 2014)(Browning, J.)(cross referencing from the guideline for being an illegal alien in possession of a firearm to the drug-possession guideline after finding by a preponderance of the evidence that the defendant committed a drug-possession crime).

The Court has previously held that it may consider a defendant's refusal to answer questions for the PSR, while not drawing an adverse inference from the refusal. See United States v. Goree, No. CR 11-0285 JB, 2012 WL 592869, at *11 (D.N.M. Feb. 13, 2012)(Browning, J.). The Court has also determine that, although it could consider the defendant's silence about information regarding herself or others engaging criminal conduct, it would not rely on that silence to increase the defendant's sentence. See United States v. Chapman, No. CR 11-0904 JB, 2012 WL 257814, at *13 n.5 (D.N.M. June 22, 2012)(Browning, J.). Finally, the Court has concluded that a defendant's "aggression towards other individuals, and the murder he may have attempted to orchestrate while incarcerated" is relevant information which the Court can consider in fashioning a proper sentence. United States v. Romero, No. CR 09-1253 JB, 2012 WL 6632493, at *23 (D.N.M. Dec. 6, 2012)(Browning, J.).

## ANALYSIS

The Court will sustain K. Ulibarri's first objection to the PSR, but overrule the second objection. First, the Court will sustain K. Ulibarri's objection to the PSR's application of § 2J1.2(b)(1)(B), because his offense did not involve threatening to cause physical injury to CHS-2 to obstruct the administration of justice. Second, the Court will not strike the description of K. Ulibarri's distribution-of-heroin charge in paragraph 70 of the PSR, because the Guide to Judiciary Policy requires the USPO to include all prior criminal history in the PSR, because the

PSR specifies that the circumstances of K. Ulibarri's distribution-of-heroin charge in CR 14-2211 MV are the same as that in this case, and because K. Ulibarri will not suffer any prejudice if the Court leaves that information in paragraph 70 of the PSR.

I.      **THE COURT WILL SUSTAIN K. ULIBARRI'S OBJECTION TO THE PSR'S APPLICATION OF § 2J1.2(b)(1)(B).**

Section 2J1.2(b)(1)(B) states: "If the offense involved causing or threatening to cause physical injury to a person . . . in order to obstruct the administration of justice, increase by 8 levels." U.S.S.G. § 2J1.2(b)(1)(B). The United States concedes -- as it must, given the lack of evidence -- that K. Ulibarri did not cause physical injury to a person. See Tr. at 4:17-5:2 (Court, Long). Instead, the United States asserts that K. Ulibarri's offense involved threatening to cause physical injury to a person to obstruct the administration of justice. See Tr. at 9:16-10:17 (Long). The Court first concludes that § 2J1.2(b)(1)(B) does not require that the defendant intended the target of the threat to feel threatened. The Court next holds that § 2J1.2(b)(1)(B) does not apply, because K. Ulibarri's offense did not involve threatening to cause physical injury to CHS-2 to obstruct the administration of justice. The Court will therefore sustain K. Ulibarri's objection to the PSR's application of § 2J1.2(b)(1)(B).

A.      **SECTION 2J1.2(b)(1)(B) DOES NOT REQUIRE THAT THE DEFENDANT INTENDED THE TARGET OF THE THREAT TO FEEL THREATENED.**

The Tenth Circuit "'interprets the Sentencing Guidelines according to accepted rules of statutory construction.'" United States v. Hammons, No. CR 07-1164 JB, 2012 WL 119616, at *23 (D.N.M. Jan. 12, 2012)(Browning, J.)(quoting United States v. Nacchio, 573 F.3d 1062, 1066 (10th Cir. 2009)). The Court thus "first look[s] at the guideline's plain language and, if unambiguous, appl[ies] the words of the [guideline] as they appear on [their] face." United States v. Rosales-Valdez, 375 F. Supp. 2d 1152, 1163 (D.N.M. 2004)(Browning, J.). Neither the

text nor the commentary of § 2J1.2(b)(1)(B) defines "threatening," and no court has addressed the issue.  Nevertheless, the Court concludes that § 2J1.2(b)(1)(B) does not require that the defendant intended the target of the threat to feel threatened, for three reasons.

### 1.    The Dictionary Definitions of Threat Do Not Require that the Speaker Intended the Target of the Threat to Feel Threatened.

First, the dictionary definitions of threat do not require that the speaker intended the target of the threat to feel threatened.  Black's Law Dictionary defines threat as "[a] communicated intent to inflict harm or loss on another or on another's property, esp[ecially] one that might diminish a person's freedom to act voluntarily or with lawful consent."  Black's Law Dictionary 1618 (10th ed. 2014).  The Oxford English Dictionary defines threat as "declar[ing] (usually conditionally) one's intention of inflicting injury upon" a person.  11 Oxford English Dictionary 352 (2d ed. 1998).  Webster's Third New International Dictionary defines threat as an "expression of an intention to inflict loss or harm on another by illegal means and esp[ecially] by means involving coercion or duress of the person threatened."  Webster's Third New International Dictionary 2382 (1993).  Other dictionaries offer similarly broad definitions of threat.  See American Heritage Dictionary of the English Language 1801 (4th ed. 2000)("An expression of an intention to inflict pain, injury, evil, or punishment."); Random House Unabridged Dictionary 1975 (2d ed. 1987)("[A] declaration of an intention or determination to inflict punishment, injury, etc., in retaliation for, or conditionally upon, some action or course.").  None of these definitions require that the defendant intended the recipient of the threat to feel threatened.

2. **The Supreme Court's Holding in Elonis v. United States, 135 S. Ct. 2001 (2015) Does Not Require the Court to Interpret § 2J1.2(b)(1)(B) as Requiring that the Defendant Intended the Target of the Threat to Feel Threatened.**

Second, the Supreme Court's recent holding in Elonis v. United States does not require the Court to interpret § 2J1.2(b)(1)(B) as requiring that the defendant intended the target of the threat to feel threatened.  That case involved Anthony Elonis, who posted rap lyrics on his Facebook[13] page that contained graphically violent language and imagery concerning his estranged wife, co-workers, elementary-school students, and state and local law enforcement. See 135 S. Ct. at 2004-07.  Concluding that a reasonable person would foresee that Elonis' posts would be interpreted as a threat, a jury convicted Elonis of violating 18 U.S.C. § 875(c), which makes it a federal crime to transmit in interstate commerce "any communication containing any threat . . . to injure the person of another."  135 S. Ct. at 2007 (citation omitted)(internal quotation marks omitted).  The United States Court of Appeals for the Third Circuit affirmed Elonis' conviction.  See 135 S. Ct. at 2007.

The Supreme Court reversed.  See 135 S. Ct. at 2007.  In an opinion that the Honorable John G. Roberts, Chief Justice of the United States, authored, the Supreme Court began its analysis by noting that the dictionary definitions of threat do not set forth an intent requirement. See 135 S. Ct. at 2008 ("These definitions . . . speak to what the statement conveys[,] not to the mental state of the author").  The Chief Justice explained, however, that the "'mere omission from a criminal enactment of any mention of criminal intent' should not be read 'as dispensing with'" such a requirement.  135 S. Ct. at 2009 (quoting Morissette v. United States, 342 U.S.

---

[13]Facebook "is an online social networking service" that allows users to "create a user profile, add other users as friends, exchange messages, post status updates and photos, share videos and receive notifications when others update their profiles."  Facebook, Wikipedia.org, https://en.wikipedia.org/?title=Facebook (last visited June 24, 2015).

246, 250 (1952)).  Instead, the Chief Justice noted, courts must read a *mens rea* requirement into such statutes to "separate wrongful conduct from otherwise innocent conduct."  135 S. Ct. at 2010 (internal quotation marks omitted).  Chief Justice Roberts said that this rule of construction reflects the basic principle that "wrongdoing must be conscious to be criminal" and that a defendant must be "blameworthy in mind" before he can be found guilty.  135 S. Ct. at 2009 (internal quotation marks omitted).  Chief Justice Roberts said that the trial judge erred in using a reasonable person standard, because that standard did not require proof that Elonis was aware of his wrongdoing.   See 135 S. Ct. at 2009-12.  Without specifying the intent that § 875(c) requires, the Chief Justice said only that "negligence is not sufficient."  135 S. Ct. at 2013.

Unlike § 875(c), § 2J1.2(b)(1)(B) of the Sentencing Guidelines already contains a *mens rea* requirement.  For § 2J1.2(b)(1)(B) to apply, the defendant must have acted "in order to obstruct the administration of justice."  U.S.S.G. § 2J1.2(b)(1)(B)(emphasis added).  See United States v. Blount, 364 F.3d 173, 178 (4th Cir. 2004)("Thus, in order for § 2J1.2(b)(1) to apply, the government must show that Blount caused physical injury with the specific intent to obstruct justice . . . ."), vacated on other grounds by 543 U.S. 1105 (2005).  Because § 2J1.2(b)(1)(B) already "separate[s] wrongful conduct from otherwise innocent conduct," Elonis v. United States, 135 S. Ct. at 2011, an additional *mens rea* requirement is unnecessary.  Further, even if § 2J1.2(b)(1)(B) had no *mens rea* requirement, the Tenth Circuit has repeatedly held that, unlike a criminal statute, when a sentencing guideline does not include a *mens rea* element, courts "should not interpret the guideline as containing such an element."   United States v. Ray, 704 F.3d 1307, 1312 (10th Cir. 2013).  See United States v. Nava-Sotelo, 354 F.3d 1202, 1207 (10th Cir. 2003)("Not only is the distinction between elements and sentencing factors clear, but the rationale for implying a *mens rea* element in criminal statutes is absent when addressing

sentencing factors.").  The Tenth Circuit has explained that the common-law presumption that criminal laws include a *mens rea* element does not apply to the Guidelines, because the Guidelines "may compound the punishment for the offense, but fall far short of criminalizing apparently innocent conduct."  United States v. Ray, 704 F.3d at 1312.  Other circuits agree with the Tenth Circuit's approach.  See, e.g.,  United States v. Serfass, 684 F.3d 548, 552 (5th Cir. 2012)("[T]he § 2D1.1(b)(5) sentencing enhancement applies if the offense involved the importation of amphetamine or methamphetamine regardless of whether the defendant had knowledge of that importation."  (internal quotation marks omitted)); United States v. McClain, 252 F.3d 1279, 1286 (11th Cir. 2001)("We find no qualifying language in section 3B1.4 reserving the enhancement for defendants who knew that the person drawn into their criminal activity was a minor."); United States v. Lavender, 224 F.3d 939, 941 (9th Cir. 2000)("Sentencing factors . . . are not separate criminal offenses and as such are not normally required to carry their own *mens rea* requirements."); United States v. Schnell, 982 F.2d 216, 220-21 (7th Cir. 1992)(finding the absence of a *mens rea* requirement under § 2K2.1(b)(4) constitutional).  No court has evaluated whether Elonis v. United States requires courts to read a *mens rea* requirement into guidelines that do not have one; the case said nothing, however, about the Sentencing Guidelines and did not purport to overrule these decisions.  The Court therefore concludes that Elonis v. United States left their holdings intact.   Accordingly, even if § 2J1.2(b)(1)(B) contained no *mens rea* requirement, the Supreme Court's decision in Elonis v. United States would not require the Court to read one into it.

### 3.     The First Amendment of the Constitution of the United States of America Does Not Require the Court to Read § 2J1.2(b)(1)(B) as Requiring that the Defendant Intended the Target of the Threat to Feel Threatened.

The First Amendment does not require the Court to read an additional *mens rea* element into § 2J1.2(b)(1)(B).  The First Amendment protects "vehement, caustic, and sometimes unpleasantly sharp attacks," and language that is "vituperative, abusive, and inexact."  Watts v. United States, 394 U.S. 705, 708 (1969).  The First Amendment even covers "threats of vilification or social ostracism."  N.A.A.C.P. v. Claiborne Hardware Co., 458 U.S. 886, 910 (1982).  The First Amendment excepts such speech from criminal prosecution even though "it may embarrass others or coerce them into action."  N.A.A.C.P. v. Claiborne Hardware Co., 458 U.S. at 910.  Indeed, "[s]peech related to the expression and advocacy of unpopular, and even violent ideas, receives [First Amendment] protection."  United States v. White, 610 F.3d 956, 960 (7th Cir. 2010).

The First Amendment does have limits, however.  Speech integral to criminal conduct -- such as fighting words, true threats, and solicitations -- remain categorically outside its protection.  See United States v. Williams, 553 U.S. 285, 297 (2008)("Offers to engage in illegal transactions are categorically excluded from First Amendment protection."); New York v. Ferber, 458 U.S. 747, 761-62 (1982)("It has rarely been suggested that the constitutional freedom for speech . . . extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute."  (internal quotation marks omitted)).  For this reason, a state cannot forbid individuals from burning crosses to express an opinion, but it can forbid individuals from burning crosses with the intent to intimidate others.  See Virginia v. Black, 538 U.S. 343, 365-66 (2003).  The state can prohibit speech knowingly made to jurors outside of an official proceeding "with the intent to influence the outcome of a specific case."

Turney v. Pugh, 400 F.3d 1197, 1202 (9th Cir. 2005).  The state can also forbid individuals from knowingly attempting to influence the decision of a juror upon an issue or matter pending before that juror.  See United States v. Heicklen, 858 F. Supp. 2d 256, 275 (S.D.N.Y. 2012).  Most pertinent to this case, the state can prohibit speech made "to influence, delay, or prevent [a witness'] testimony."  United States v. White, 670 F.3d 498, 514 (4th Cir. 2012)(quoting 18 U.S.C. § 1512(b))(internal quotation marks omitted).  The key line between what is permissible and impermissible prohibition of speech is intent.  See United States v. Williams, 553 U.S. at 298 ("[T]here remains an important distinction between a proposal to engage in illegal activity and the abstract advocacy of illegality.").  Although the state cannot criminalize speech alone, a speaker loses his or her First Amendment protections once he or she utters those same words with a criminal purpose.

Like the examples above, § 2J1.2(b)(1)(B) contains a *mens rea* "hook": it does not prohibit mere speech, but is instead limited to situations in which the defendant acts "in order to obstruct the administration of justice."  U.S.S.G. § 2J1.2(b)(1)(B).  Given the importance of witnesses and their testimony to the proper administration of justice, the Court sees no reason why the First Amendment would or should protect such statements.  Cf. Pennekamp v. Florida, 328 U.S. 331, 367 (1946)("In securing freedom of speech, the Constitution hardly meant to create the right to influence judges or juries.  That is no more freedom of speech than stuffing a ballot box is an exercise of the right to vote.").  Accordingly, the First Amendment does not require the Court to read an additional *mens rea* requirement into § 2J1.2(b)(1)(B).[14]

---

[14]That K. Ulibarri's words do not constitute a "true threat" does not alter the Court's decision.  The "true threat" doctrine originated in Watts v. United States.  That case involved Robert Watts, who appealed his conviction for violating 18 U.S.C. § 871, which prohibits any person from "knowingly and willfully . . . [making] any threat to take the life of or to inflict bodily harm upon the President of the United States."  Watts v. United States, 394 U.S. at 705.

- 40 -

Watts' conviction arose from a statement that he made during an anti-Vietnam War rally in 1966:

> They always holler at us to get an education.  And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming.  I am not going.  If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.

394 U.S. at 706.

The Supreme Court reversed Watts' conviction.  394 U.S. at 706-08.  After recognizing the nation's valid, "even overwhelming," interest in protecting the President's life, the Supreme Court observed: "Nevertheless, a statute such as this one, which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind.  What is a threat must be distinguished from what is constitutionally protected speech."  394 U.S. at 707.  The Supreme Court went on to hold that, "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," 394 U.S. at 708 (citation omitted)(internal quotation marks omitted), Watts' speech did not rise to the level of "true threat" and was thus protected by the First Amendment, 394 U.S. at 708.

In the wake of United States v. Watts, courts have read into federal criminal threat statutes "any scienter necessary to satisfy the demands of the First Amendment."  United States v. Heineman, 767 F.3d at 973.  The Tenth Circuit has thus interpreted 18 U.S.C. § 875(c) -- which prohibits the transmission in interstate or foreign commerce of any communication containing "any threat to injure the person of another," but contains no *mens rea* element -- as requiring that the defendant "subjectively intended the recipient to feel threatened."  United States v. Twitty, 591 F. App'x 676, 681 n.4 (10th Cir. 2015)(citing United States v. Heineman, 767 F.3d at 978).

Unlike § 875(c), which would run afoul of the First Amendment absent an imputed *mens rea* requirement, § 2J1.2(b)(1)(B) already contains a *mens rea* requirement.  It is therefore more similar to 18 U.S.C. § 1512(b), which prohibits "knowingly uses intimidation, threatens, or corruptly persuades another person . . ., with intent to influence, delay, or prevent the testimony of any person in an official proceeding," than to 18 U.S.C. § 875(c).  Because speech which falls under § 1512(b) merits no First Amendment protection, see United States v. White, 670 F.3d at 514, the Court does not to fit it within the "true threat" exception for § 2J1.2(b)(1)(B) to pass First Amendment muster.

Moreover, the Court questions whether the First Amendment applies to the Sentencing Guidelines.  A sentencing enhancement "is treated differently than a criminal statute in a number of fundamental respects."  United States v. Ray, 704 F.3d at 1312.  "For instance, unless they increase the penalty for a crime beyond the prescribed statutory maximum, sentencing factors, unlike elements of an offense, need not be alleged in the indictment, submitted to the jury or proven beyond a reasonable doubt."  United States v. Nava-Sotelo, 354 F.3d at 1206 n.9.  See Alleyne v. United States, 133 S. Ct. at 2155 (extending Apprendi v. New Jersey to cover facts that increase the mandatory minimum sentence, as well as the maximum sentence).  As the Court has already explained, the Tenth Circuit does not require courts to read a *mens rea* element

**B.     K. ULIBARRI'S OFFENSE DID NOT INVOLVE THREATENING TO CAUSE PHYSICAL INJURY TO CHS-2 TO OBSTRUCT THE ADMINISTRATION OF JUSTICE.**

For § 2J1.2(b)(1)(B) to apply, the United States must prove two elements by a preponderance of the evidence.  First, K. Ulibarri's offense must involve "threatening to cause physical injury to a person."  U.S.S.G. § 2J1.2(b)(1)(B).  This element requires that K. Ulibarri "communicate[d an] intent to inflict [physical injury] on another,"  Black's Law Dictionary 1618; it does not require, however, that K. Ulibarri communicated the threat to CHS-2, United States v. Grap, 368 F.3d 824, 831 (8th Cir. 2004); United States v. Moody, 97 F.3d 1420, 1425 (11th Cir. 1992).   Second, K. Ulibarri must have made that threat "in order to obstruct the administration of justice."  U.S.S.G. § 2J1.2(b)(1)(B).  Although the United States has shown that K. Ulibarri communicated an intent to inflict physical injury on CHS-2, it has not proven

───────────────

into Sentencing Guidelines that do not have one.  See United States v. Nava-Sotelo, 354 F.3d at 1207.  This is because, unlike criminal statutes, the Guidelines "may compound the punishment for the offense, but fall far short of criminalizing apparently innocent conduct."  United States v. Ray, 704 F.3d at 1312.  That neither the Tenth Circuit nor the other Courts of Appeals that have adopted this rule have analyzed this rule's potential First Amendment ramifications at least suggests that the First Amendment may not apply.

The rationale behind the "true threat" and other similar First Amendment doctrines -- that adding a *mens rea* requirement to statutes that otherwise have none avoids criminalizing otherwise innocent speech -- is absent in the Guidelines context, because the defendant "has demonstrated a vicious will by committing the principle offense."  United States v. Brantly, 68 F.3d 1283, 1290 (11th Cir. 1995).  The Court already has the authority to prohibit sexual offenders from watching a wide swath of movies or visiting vast portions of the internet, and to prevent defendants from associating with certain individuals, visiting certain locations, and wearing certain clothes.  The Court also has the concurrent power to revoke supervised release for defendants who violate such conditions.  The federal courts routinely allow searches of those under supervised release that, if performed on other citizens, would likely violate the Fourth Amendment.  Federal courts also require defendants to report any contact with law enforcement; similar compulsion of an average citizen would likely violate the Fifth Amendment.  If the Court has such far-reaching power to impose punishments on defendants after they have been convicted, there appears to be no sound reason why the Court could not impose a guideline adjustment that increases a defendant's offense level based solely on the defendant's speech and does not include a *mens rea* requirement.

that K. Ulibarri did so to obstruct the administration of justice.  Section 2J1.2(b)(1)(B) therefore

does not apply.

As an initial matter, that K. Ulibarri pled to obstruction of justice under § 1512(c)(2) does

not mean that § 2J1.2(b)(1)(B) automatically applies.  Section 1512(c)(2) requires only that the

defendant "corruptly . . . obstructs, influences, or impedes any official proceeding, or attempts to

do so."  18 U.S.C. § 1512(c)(2).  As K. Ulibarri correctly observes, the Tenth Circuit has held

that § 1512(c)(2) requires only that "it is foreseeable that the defendant's conduct will interfere

with an official proceeding."  United States v. Phillips, 583 F.3d at 1264.  As § 1512(c)(2) does

not require that the defendant threatened to cause physical injury "in order to obstruct the

administration of justice," U.S.S.G. § 2J1.2(b)(1)(B), that K. Ulibarri pled to that subsection does

not automatically trigger § 2J1.2(b)(1)(B)'s application.

Reviewing K. Ulibarri's relevant conduct in this case, the Court concludes that

§ 2J1.2(b)(1)(B) does not apply.  By explaining his murder-for-hire plot to CHS-1, K. Ulibarri

communicated his intent to inflict physical injury on CHS-2.   K. Ulibarri also intended to

obstruct the administration of justice by killing CHS-2 and preventing him from cooperating

with the United States.   There is insufficient evidence, however, that K. Ulibarri made his

threat -- i.e., his statement to CHS-2 -- specifically "to obstruct the administration of justice."

U.S.S.G. § 2J1.2(b)(1)(B).  There is no indication that K. Ulibarri intended CHS-1 to tell CHS-2

about the threat or that K. Ulibarri intended for his threat to cause CHS-1 to prevent CHS-2 from

cooperating with the United States.  There is no evidence that CHS-1 or CHS-2 were friends or

family members, or that K. Ulibarri believed that they had a sufficiently close relationship such

that CHS-1 would likely tell CHS-2 about the threat.  There is no evidence that K. Ulibarri made

the threat among a group of CHS-2's friends or family members, or with anyone else who would

be likely to tell CHS-2 about the threat or otherwise prevent CHS-2 from cooperating with the United States.  K. Ulibarri did not say to CHS-1 that CHS-2 "should keep his mouth shut" or that he "should be careful who he talks to."   K. Ulibarri said nothing whatsoever to CHS-1 about warning CHS-2 of the consequences of his continued cooperation with the United States.

To the contrary, it appears that K. Ulibarri expected CHS-1 to keep the murder-for-hire plan secret.  K. Ulibarri had every reason to believe that CHS-1 would not tell CHS-2 or anyone else about the plan, because CHS-1 was now involved in a conspiracy to commit murder and could face prosecution for a serious crime if the plot were discovered.  Co-conspirators typically do not expect their conspiracy to be made public.  In fact, they fully expect and hope that their conspiracy stays secret so that they may accomplish their goal and also avoid prosecution.  CHS-1 never gave K. Ulibarri any indication that CHS-1 planned to tell CHS-2 or anyone else about the plot, and K. Ulibarri never asked or suggested that CHS-1 should do so.  Absent some additional piece of evidence -- something hinting that K. Ulibarri wanted his threat to chill CHS-2's cooperation with the United States -- the United States has failed to meet its burden, and § 2J1.2(b)(1)(B) does not apply.

The United States contends that the Court's interpretation of § 2J1.2(b)(1)(B) may lead to absurd results.  The United States says that, under the Court's interpretation, § 2J1.2(b)(1)(B) would not apply to a defendant who tries, but fails, to kill a witness but has no intent to obstruct justice; it would apply, however, to a defendant who threatens to kill a witness solely to obstruct justice and with no intention of carrying out his plan.  As an initial matter, much of the United States' concern is ameliorated by the fact that § 2A2.1 provides a base offense level of 33 for attempted first-degree murder, which is 11 levels above the offense level of 22 that results from adding the base offense level of 14 under § 2J1.2(a) to the 8-level adjustment available under

§ 2J1.2(b)(1)(B).  Section 2A2.1 would likely cover the most egregious situations -- for example, if a defendant takes a shot at a witness and misses, or plants a bomb on a witness' car and the bomb malfunctions.

More significantly, however, the United States' interpretation reads additional words into the Guideline.  Section § 2J1.2(b)(1)(B) is limited to situations in which the defendant's offense involves "causing" or "threatening to cause" physical injury to a person "in order to obstruct the administration of justice."  U.S.S.G. § 2J1.2(b)(1)(B).  If the Sentencing Commission wanted to include "attempting" to obstruct the administration of justice under § 2J1.2(b)(1)(B)'s purview, it could have substituted "attempting" for "threatening."  It chose not to do so.  The Court's task "is to apply the text, not improve upon it." Pavelic & Le Flore v. Marvel Enter. Grp., 493 U.S. 120, 126 (1989).  The Court has neither the authority nor the responsibility to second-guess the Sentencing Commission's drafting decisions.  Cf. Lamie v. U.S. Trustee, 540 U.S. 526, 542 (2004)("It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think is the preferred result."   (internal quotation marks omitted)(ellipses omitted)).   Because the United States has not offered sufficient evidence to show that K. Ulibarri's offense involved threatening to cause physical injury to obstruct the administration of justice, § 2J1.2(b)(1)(B) does not apply.

## II.     THE COURT WILL OVERRULE K. ULIBARRI'S OBJECTION TO THE PSR'S INCLUSION OF HIS DISTRIBUTION OF HEROIN CHARGE FROM THIS CASE UNDER "OTHER ARRESTS."

K. Ulibarri next objects to paragraph 70 of the PSR, which lists his distribution-of-heroin charge from CR 14-2211 MV under "Other Arrests."  Amended Objections at 4 (quoting PSR ¶ 70, at 17-18)(internal quotation marks omitted).  K. Ulibarri says that, after he informally objected to this paragraph, the USPO declined to remove it, because "it is not the same case, as it

is associated with a different Docket Number."  Amended Objections at 4.  K. Ulibarri points out

that the United States dismissed that indictment from CR 14-2211 MV after filing the

Superseding Indictment in this case, which charged K. Ulibarri for the same distribution-of-

heroin offense.  See Amended Objections at 4.

The USPO says that the offense listed in paragraph 70 is associated with a different

docket number as this case.  See Addendum at 2.  The USPO points out that the narrative in

paragraph 70 notes that the circumstances of that arrest are the same as those of the offense in

this case.  See Addendum at 2.  The USPO asserts that the PSR lists all arrests and docket

numbers that are associated with K. Ulibarri, in accordance with the Guide to Judiciary Policy,

which states that presentence reports must contain "any prior criminal record."  Addendum at 2

(citation omitted)(internal quotation marks omitted).

The Court agrees with the USPO.  Section 435 of the Guide to Judiciary Policy states:

> The officer reports [in the PSR] the criminal record in chronological order
> beginning with the earliest offense and ending with the most recent.  The officer
> provides arrest dates, charges, jurisdiction, disposition, and sources such as the
> arresting agency, NCIC, and state or local agencies.  In a narrative section, the
> officer describes the defendant's supervision status and compliance and notes any
> outstanding warrants or detainers.

8 Guide to Judiciary Policy, Part A, Ch. 4 § 435.  The Guide to Judiciary Policy requires that the

USPO include "the criminal record" of the defendant in every PSR.  It does not provide any

exceptions for charges like K. Ulibarri's distribution of heroin charge, which were originally

included in a separate indictment that the United States moved to dismiss after the Grand Jury

added the same charge to a superseding indictment.  There appears to be no prejudice to K.

Ulibarri from leaving the charge under "Other Arrests," because the PSR explains that "[t]he

circumstances of the arrest are the same as those in the instant offense," notes that the original

indictment was dismissed, and does not assess any additional criminal history points for that

arrest.  PSR ¶ 70, at 18.  K. Ulibarri does not indicate that the notation about a related arrest will impact what the Bureau of Prisons will do with him or identify any other effect of leaving the notation in the PSR.  The Court can consider a broad swath of information in sentencing proceedings.  See 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); United States v. Madrid-Gomez, 724 F. Supp. 2d at 1152 ("[S]entencing courts have broad discretion to consider various kinds of information and . . . the Guidelines did not alter this aspect of the sentencing court's discretion."  (internal quotation marks omitted)).

The Court can conclude that the Honorable Martha J. Vazquez, United States District Judge, has a related case, even though that fact is unlikely to have any impact on the sentence that the Court will give in this case.  Information does not have to be decisive or a significant factor in the ultimate sentence to be included in the PSR.  PSRs contain a lot of information that, in the end, may not be helpful to the Court's sentencing decision, but the USPO may not know that when it writes the PSR, and the Court may not know that when it reads the PSR for the first time.  Ultimately, if K. Ulibarri suffers no prejudice from leaving this information in the PSR, the Court sees no reason to strike it.  The Court will therefore overrule K. Ulibarri's objection to the PSR's inclusion of his distribution of heroin charge from CR 14-2211 MV under "Other Arrests."

**IT IS ORDERED** that the Amended Objections to PSR [and] Sentencing Memorandum, filed May 6, 2015 (Doc. 894), is sustained in part and overruled in part.  Defendant Kenneth Ulibarri's objection to paragraph 23 of the Presentence Investigation Report, disclosed April 16, 2015 ("PSR"), is sustained, and his objection to paragraph 70 of the PSR is overruled.

_____

UNITED STATES DISTRICT JUDGE

*Counsel*:

Damon P. Martinez
   United States Attorney
Joel R. Myers
Shana Long
Cynthia Weisman
Stephen R. Kotz
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Douglas E. Couleur
Santa Fe, New Mexico

     *Attorney for the Defendant*